**Opinion issued January 9, 2024**



In The

# Court of Appeals

For The

## First District of Texas

———————————

**NO. 01-22-00442-CR**

———————————

**SOSTENES LORENZO TOLENTINO, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 14**
**Harris County, Texas**
**Trial Court Case No. 2306675**

---

# O P I N I O N

Sostenes Lorenzo Tolentino was found guilty of driving while intoxicated. On

appeal, Tolentino complains that he could not understand the trial proceedings

because he was not provided with an interpreter in his native language, Nahuatl.[1] Tolentino argues that his rights under the United States and Texas Constitutions to due process and due course of law, confrontation, and counsel were denied; that the trial court violated its statutory duty to appoint an interpreter in a language he understands; and that the trial court abused its discretion when it denied his motion for new trial. Because the trial court's decision to proceed with a Spanish interpreter violated Tolentino's right to due process, we reverse and remand for a new trial.

## Background

In April 2020, Tolentino was near the scene of a separate ongoing DWI investigation. The police began questioning Tolentino and because of his interactions with the police, he was arrested and charged with DWI.

In June 2021, a year before trial, Tolentino's trial counsel moved for appointment of a Nahuatl interpreter. Trial counsel informed the trial court that he communicated with Tolentino through Tolentino's brother, who has a better understanding of Spanish. Tolentino's native language is Nahuatl, and he speaks and understands little Spanish or English. The trial court initially attempted to provide a Nahuatl interpreter but eventually, over Tolentino's objection, appointed a Spanish interpreter for Tolentino and proceeded with trial in June 2022. A jury found

---

[1] Nahuatl is an indigenous language spoken in Mexico.

2

Tolentino guilty of DWI and the trial court sentenced him to one year confinement probated for 15 months of community supervision.

Tolentino moved for a new trial, arguing that his rights under the United States and Texas Constitutions to due process and due course of law, confrontation, and counsel were denied. He also argued that the trial court violated its statutory duty to appoint an interpreter in a language he understands. The trial court denied his motion.

**Due Process**

Tolentino argues that his right to due process was violated by the trial court's appointment of a Spanish interpreter instead of a Nahuatl interpreter.

**A.      Standard of Review**

We review a trial court's decision to appoint an interpreter for an abuse of discretion. *See Balderas v. State*, 517 S.W.3d 756, 777–78 (Tex. Crim. App. 2016). Whether the trial court took adequate steps to ensure that a defendant sufficiently understood the proceedings is also reviewed for an abuse of discretion. *Linton v. State*, 275 S.W.3d 493, 502 (Tex. Crim. App. 2009). We reverse only when the trial court's ruling lies outside the zone of reasonable disagreement. *Id.* at 503; *see also Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (before reviewing court reverses trial court's decision, it must find ruling was so clearly wrong as to lie outside zone within which reasonable people might disagree).

**B.     Analysis**

The parties do not dispute that Tolentino required an interpreter, only whether a Spanish interpreter satisfied this need. If a defendant cannot understand the proceedings, fundamental fairness and due process require that the court provide an interpreter. *See Linton*, 275 S.W.3d at 500. Whether an accused receives adequate interpretation is a matter within the trial court's discretion because it depends on "a potpourri of factors." *Id.* "The question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services . . . were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Id.*

The constitutional guarantee of due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). That guarantee encompasses both the right of a defendant to confront witnesses against him and his right to assist in his own defense. *See* U.S. CONST. amend. VI; *Chambers*, 410 U.S. at 295; *Pointer v. Texas*, 380 U.S. 400, 405 (1965). While the Constitution does not guarantee every defendant a perfect trial, it requires "that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense." *Ex Parte Cockrell*, 424 S.W.3d 543, 557 (Tex. Crim. App. 2014) (internal quotations omitted). The Court of Criminal Appeals has considered that a defendant is denied due process when

4

(1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

*Linton*, 275 S.W.3d at 505 (internal quotation omitted). "The ultimate question is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Id.* at 503.

Tolentino moved for a Nahuatl language interpreter. The trial court stated on the record that it could not "put [Tolentino] to trial without having a qualified interpreter interpreting for him." The trial court acknowledged if it could get a Nahuatl interpreter it would proceed with trial, otherwise it would not. At a later hearing, the trial court acknowledged that Nahuatl interpreters were available, but either they would need an additional interpreter to translate from English to Spanish and then from Spanish to Nahuatl or the English-to-Nahuatl interpreter would have to translate remotely because they were unable to physically attend trial.

A few months later, the trial court told the parties that it would provide a Spanish interpreter instead of a Nahuatl interpreter. The trial court held a hearing in which it stated it considered Detective A. Nerio's testimony about video of Tolentino's arrest provided at an earlier pretrial hearing. Detective Nerio testified that in the video he had a "full conversation" with Tolentino in Spanish.

5

The video depicts Detective Nerio approaching Tolentino and shouting "hey" at Tolentino. Detective Nerio then repeatedly asks Tolentino the same question to which Tolentino responds by grunting. Detective Nerio then asks a different question repeatedly and Tolentino mumbles unintelligibly. Detective Nerio spends most of the interaction speaking and repeating questions. Tolentino can be seen staring blankly at Detective Nerio, occasionally grunting, and mumbling short phrases. Detective Nerio translated his conversation with Tolentino as follows:

> [Det. Nerio]: What are you doing? What are you doing? His response was, [n]othing.
>
> [State]: What was your conversation about?
>
> [Det. Nerio]: Why did you come here? What are you doing here? You're – you've urinated – sorry, I didn't quite hear everything. Sorry. Stop. What are you doing? What are you doing? What are you doing? Nothing. Why did you come here? Why did you come here? Why did you come? Why did you come here?
>
> [State]: What do you think of the way that the defendant spoke?
>
> [Det. Nerio]: Slurred and swaying. For nothing. And why? You're urinating, you're intoxicated, and you're about to start driving. And then I'm basically motioning around the head, What is not functioning up here? Where do you live? Where do you live?
>
> [State]: So what did—where did he say he lived?
>
> [Det. Nerio]: He, basically, at that point just pointing down the street. I do nothing. I do nothing.
>
> [State]: What did he say there?

[Det. Nerio]: I'm not doing anything, son.

Detective Nerio then calls Tolentino a "fucker," handcuffs him, and escorts him to the back of his patrol vehicle. Tolentino can be heard mumbling the same words to himself while being handcuffed.

After opening the back door to his patrol vehicle, Detective Nerio instructs Tolentino in Spanish, but Tolentino does not respond. Detective Nerio turns Tolentino around so Tolentino's back is facing the interior of the patrol vehicle so Tolentino can get inside. Tolentino makes a brief comment to which Detective Nerio testified that he responded by asking Tolentino, "You can't lift your leg up? Why can't you lift your leg up?" Tolentino then repeats a short question to Detective Nerio, which Detective Nerio does not respond to. Then Detective Nerio is seen using his hand to push Tolentino into the vehicle while Tolentino begins repeating an earlier phrase. Detective Nerio ignores Tolentino and lifts Tolentino's leg into the vehicle before closing the door.

The video then briefly depicts Detective Nerio's investigation away from Tolentino before he returns to speak to Tolentino in the back of his vehicle. Detective Nerio and Tolentino then have a broken exchange of repeated questions and short responses for about 30 seconds. Based on this evidence, the trial court stated it would proceed with a Spanish interpreter and overruled Tolentino's objection.

The State compares this case to *Martins v. State*, where the defendant complained that he required a Portuguese interpreter but was given a Spanish interpreter. *See* 52 S.W.3d 459, 471 (Tex. App.—Corpus Christi-Edinburg 2001, no pet.). But there are significant differences. In *Martins*, the defendant did not request a Portuguese interpreter or object to a Spanish interpreter. *See id.* Here, Tolentino did both. Moreover, the record in *Martins* lacked any evidence of the defendant's difficulty understanding Spanish. *Id.* at 472. Instead, there was evidence that the defendant had a Spanish-speaking wife, testified at trial in Spanish, and communicated with his attorney in Spanish. *See id. Martins* was decided based on the defendant's failure to object to the appointment of a Spanish translator and the lack of evidence that he required a Portuguese interpreter. *See id.* at 473. That is not the case here. Tolentino made his request and objection clear to the trial court, and the trial court was aware that Tolentino's Spanish-speaking attorney could not communicate with Tolentino without Tolentino's brother translating to Nahuatl.

Upon Tolentino's objection, the trial court asked whether Tolentino communicated with his family members in Spanish. Trial counsel responded that Tolentino communicates with his family primarily in Nahuatl because they are from the same region of Mexico and that Tolentino's job does not require him to communicate "with anybody really[] but himself." Trial counsel also highlighted that Nahuatl can be a difficult language because there are no phrases or words for

8

certain terms and that his primary communication with Tolentino relied on Tolentino's brother as his interpreter.

The only evidence that Tolentino understood Spanish was Detective Nerio's testimony about the video of the arrest. But the record reflects that Detective Nerio's brief conversation with Tolentino involved Detective Nerio repeatedly asking Tolentino the same questions while Tolentino grunted, mumbled "nothing" or "I do nothing" in Spanish, and pointing down the street in response to being repeatedly asked where he lived.

In *Linton*, the Court of Criminal Appeals recognized that a defendant may receive a fair trial absent a perfect translation. 275 S.W.3d at 508. There, the defendant testified at a hearing and often answered questions before the interpreter translated them, and there were direct exchanges between the trial court and the defendant using an American Sign Language interpreter. *Id.* at 505–06. These exchanges reflected the defendant's "ability to communicate effectively." *Id.* at 506. There was also evidence that the defendant, graduated from high school and was admitted to college, understood sufficient English to obtain a driver's license, could communicate sufficiently with another person to exchange information related to a car accident, and could follow law enforcement's instructions. *Id.* at 509. The record here contains no similar communications or evidence.

In reaching its holding, the *Linton* court considered cases from across the country where defendants were given interpreters in languages other than what they claimed they required. We consider their applicability here.

One such case is *People v. Warcha*, where a Spanish interpreter was permissible because there was ample evidence of the defendant's Spanish proficiency despite his late request for a Quiche interpreter. 17 A.D.3d 491, 492–93 (N.Y. App. Div. 2005). The defendant raised his request for a Quiche interpreter 10 months into the case, after pretrial proceedings, and two days into jury selection. *Id.* at 492. The trial court had two Spanish interpreters independently interview the defendant, and they reported that the defendant could understand Spanish if they spoke slowly. *Id.* The trial court ordered a recess to locate a Quiche interpreter, but none was found. Before proceeding without a Quiche interpreter, the trial court had a conversation with the defendant and determined that the defendant was proficient in Spanish. *Id.* The trial court also instructed the interpreters to signal the court whenever necessary to ensure that the defendant would have the proceedings fully explained to him. *Id.* at 493. Moreover, there was evidence that the defendant had communicated in Spanish with co-workers for two years, that his education was in Spanish and Quiche, and that he had communicated with counsel in Spanish during the 10 months of his case. *Id.* at 492–93.

Another case *Linton* considered, *Gado v. State*, held that proceeding with a French interpreter over the defendant's objection and request for a Djerma interpreter was permissible when there was ample evidence that the defendant understood French and English. 882 N.E.2d 827, 830–31 (Ind. Ct. App. 2008). The trial court attempted to procure a certified Djerma interpreter upon the defendant's request but only found two uncertified Djerma interpreters. *Id.* at 829. During trial, the interpreters told the trial court that they were threatened with repercussions if they continued translating. *Id.* The trial court suspected the defendant made these threats and declared a mistrial. *Id.* The trial court tried to find another Djerma interpreter but was unsuccessful. *Id.* During a hearing to determine the defendant's language proficiency, the trial court recalled interacting with the defendant on several occasions in English and that the defendant had participated in earlier proceedings using a French interpreter. There was also evidence that the defendant had conversations in English lasting over an hour on various topics including his family, where he lived, and his criminal history. *Id.* at 830–831.

*Linton* also considered *Costa v. Williams*, where the court found that using a Spanish interpreter was sufficient when there was evidence that the Portuguese defendant gave detailed answers to the trial court's questions and never made a request for a Portuguese interpreter until his habeas petition. 830 F. Supp. 223, 224 (S.D.N.Y.1993). Moreover, the defendant's petition was written in English and

signed by him without any indication that an interpreter was used or necessary. *Id.* at 224 n.2.

Here, Tolentino made the trial court aware of his need for a Nahuatl interpreter a year before trial. No independent Spanish interview was done with Tolentino before trial. Trial counsel informed the trial court that he used a Nahuatl speaker to communicate with Tolentino. And Tolentino's family communicated in Nahuatl. Thus, the cases highlighted in *Linton* are inapposite.

Because the trial court was aware that Tolentino had difficulty understanding English, it was required to ensure that the trial proceedings were translated into a language that Tolentino could understand. *Garcia v. State*, 149 S.W.3d 135, 145 (Tex. Crim. App. 2004). The trial court recognized the need for a Nahuatl interpreter and delayed the trial for a year to procure one, but it changed course based on testimony from Detective Nerio. While a trial court "must be given wide discretion," the ultimate question before this Court is whether any inadequacy in the interpretation made the trial fundamentally unfair. *Linton*, 275 S.W.3d at 503. *Linton* instructs us that we measure the trial court's decision on interpretive services by whether the defendant has a basic understanding of the proceedings to support his participation in them. *See id.* at 500–04 (trial is fundamentally unfair when defendant is unable to assist in his own defense).

The record shows that during Tolentino's arrest he appeared confused and spoke minimal broken Spanish and that trial counsel, a Spanish speaker, had to rely on a Nahuatl speaker to communicate with Tolentino, so it follows that Tolentino would not be able to understand the proceedings well enough to assist in his own defense absent a Nahuatl interpreter. The record also reflects that a Nahuatl interpreter was available, at least virtually, but that the trial court chose not to use that interpreter. We find that the interpretation provided was inadequate because Tolentino required a Nahuatl interpreter, so the trial was fundamentally unfair. *Id.* at 505 (defendant is denied due process when "the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension" (internal quotation omitted)). Accordingly, the trial court's decision to proceed with a Spanish interpreter was an abuse of discretion.

We reverse and therefore need not consider Tolentino's remaining issues. *See* TEX. R. APP. P. 47.1.

13

## Conclusion

We reverse and remand for new trial.



Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Farris.

Publish. TEX. R. APP. P. 47.2(b).